**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF KENTUCKY**
**PIKEVILLE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| CLEARWATER NATURAL RESOURCES, LP; ET AL., | ) ) | CASE NO. 09-70011 |
| | ) | JOINTLY ADMINISTERED |
| DEBTORS. | ) | |
| | ) | JUDGE WILLIAM S. HOWARD |
| | ) | |

**ARCH ENERGY RESOURCES, LLC MOTION TO MODIFY THE STAY TO PERMIT TERMINATION OF CONTRACT WITH DEBTOR FOR POST-PETITION BREACHES**

Pursuant to 11 U.S.C. § 362(d), Federal Rules of Bankruptcy Procedure 4001(a) and 9014, and Local Rule 4001-1, Arch Energy Resources, LLC ("Arch"), by counsel, files this motion requesting a modification of the automatic stay in order to permit Arch to terminate a coal sales contract with Debtor Miller Bros. Coal, LLC due to the Debtor's post-petition breach of that contract (the "Motion"). In support of this Motion, Arch respectfully states as follows:

**DEBTOR IDENTIFICATION**

1.      As required by this Court's order dated January 9, 2009 [Docket No. 90], Arch identifies the Debtor for whom this Motion is relevant as **Miller Bros. Coal, LLC**, the Debtor in **Case No. 09-70012**, which case is jointly administered as part of the above-captioned proceedings pursuant to this Court's Order Granting Motion For Joint Administration entered on January 9, 2009 [Docket No. 82].

**JURISDICTION AND VENUE**

2.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157.

3. The statutory predicate for the relief requested in this Motion is 11 U.S.C. §§ 362(d)(1).

4. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTS

5. On January 7, 2009 (the "Petition Date"), Clearwater Natural Resources, LP, Miller Bros. Coal, LLC ("MBC"), and Clearwater Natural Resources, LLC (collectively, the "Debtors") each filed a petition for relief under chapter 11 of the United States Code (the "Bankruptcy Code"), commencing the above-captioned bankruptcy cases (the "Cases").

6. Since the Petition Date, the Debtors have continued to operate and manage their businesses as debtors in possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

7. MBC is a party to a Spot Coal Purchase & Sales Contract dated October 1, 2008 with Arch (the "Contract"), a copy of which is attached hereto as *Exhibit A*. Under the terms of the Contract, the parties agreed that MBC would sell, and Arch would purchase, approximately 65,000 tons of coal between December 31, 2008 and December 31, 2009, for a price of $80.00 per ton. The shipment instructions in the Contract provided for the delivery of approximately 5,000 tons per month.

8. As is typical with coal supply agreements, the terms of the Contract further set forth the required quality specifications for the coal to be delivered to and purchased by Arch. The specifications are to be determined on an "as received basis" and require a moisture content of no more than 7%, ash content of no more than 12.50%, sulfur content of no more than 3.50%, and a minimum of 12,000 BTUs. (Contract at 1, ¶ (11).)

9. In addition, Arch specifically reserved its right "to cancel this order if as received quality does not meet specifications on any weekly composite." (Contract at 1, ¶ (18) (emphasis

{L0455055.4}                                      2

added).)  No notice is required for such termination, and no basis is required other than that the coal quality specifications are not met.

10.  The Contract is a forward contract, and Arch is a forward contract merchant within the meaning of the Bankruptcy Code.

11.  Since the Petition Date, MBC has continued to make deliveries of coal to Arch pursuant to the terms of the Contract.

12.  However, the coal delivered for the weekly period from April 19, 2009 through April 25, 2009 failed to meet the specifications required by the Contract.  Tests on samples from the coal delivered from April 19 through April 25 revealed that the delivered coal ranged from 11,098 BTUs to 12,453 BTUs, with a weekly composite of only 11,853 BTUs.  (See Producer Performance Reports attached hereto as *Exhibit B*.)  This weekly composite of 11,853 BTUs is less than the required quality specification of 12,000 BTUs (the "Post-Petition Breaches").

13.  As a result of these Post-Petition Breaches, Arch has the right to terminate the Contract pursuant to paragraph 18 of the Contract.

14.  Because the Contract is a forward contract, and Arch is a forward contract merchant, Arch can terminate the Contract without relief from the stay.  Even so, out of an abundance of caution and in respect of the court process, Arch has not taken any action in furtherance of the Post-Petition Breaches at this time because of the existence of the automatic stay and engaged its undersigned counsel to file this Motion.  Arch reserves all of its rights to argue that the Contract is a forward contract and that it can terminate the Contract without the necessity of relief from the automatic stay.

15.  Based on the Post-Petition Breaches and the terms the Contract, Arch is justifiably concerned that the Debtors will be unable to make future deliveries of coal of the

quality specifically mandated by the Contract and decided to exercise its right to terminate the Contract.  Without the relief sought in this Motion, Arch bears the risks attendant with MBC's future non-performance and will not receive the benefit of its bargain as provided under the terms of the Contract.

## LEGAL AUTHORITY

16.     Under § 362(d), the bankruptcy courts shall lift the automatic stay "for cause:"

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay --
>
> (1)  for cause, including the lack of adequate protection of an interest in property of such party in interest.

11 U.S.C. § 362(d)(1).

17.     The Bankruptcy Code does not define "cause."  Therefore, bankruptcy courts must determine when discretionary relief is appropriate under § 362(d) on a case-by-case basis. In re Laguna Assocs. L.P., 30 F.3d 734, 737 (6th Cir. 1994).  The burden of proof is squarely on the Debtor to demonstrate why the automatic stay should remain in effect.  11 U.S.C. § 362(g) (stating that party requesting relief from the stay has burden of demonstrating debtor's equity in property and the debtor "has the burden of proof on all other issues").

18.     A debtor's noncurable default under a contract with a movant constitutes cause under § 362(d)(1) to modify the stay.  See In re Williams, 299 B.R. 684, 686-87 (Bankr. S.D. Ga. 2003); In re New Breed Realty Enters., Inc., 278 B.R. 314, 325 (Bankr. E.D.N.Y. 2002); In re Deppe, 110 B.R. 898, 906-07 (Bankr. D. Minn. 1990); In re Ruiz, 98 B.R. 636, 638-39 (Bankr. D.P.R. 1988).

19. This principle is based on the fact a debtor's rights under an executory contract are property of the estate, and under § 365(b), the debtor may either assume or reject those rights. If the debtor cannot assume the contract in accordance with the requirements of § 365(b), there is no reason to prohibit the non-debtor party from exercising its rights under such contract, including the right to terminate that contract. See Deppe, 110 B.R. at 906-07 ("Given the inevitable outcome of any contest over the estate's claim to administer those rights, it should restrain [the non-debtor party] no longer.")

20. Noncurable defaults are typically non-monetary, performance defaults and are in the nature of historical fact. New Breed, 278 B.R. at 320. That is, the defaults occurred, and the Debtor cannot go back in time, alter its performance, and negate the default.

21. Non-monetary defaults, however, must be cured prior to assumption of a contract. See 11 U.S.C. § 365(b)(2)(D) (setting forth exception to cure requirement, which applies only to satisfaction of penalty rates or penalty provisions); In re Claremont Acquisition Corp., 113 F.3d 1029, 1034-35 (9th Cir. 1997) (interpreting § 365(b)(2)(D) and holding that ". . . Debtors' obligation to cure their [failure to operate the franchises for seven consecutive days] default is not excused. Because Debtors are unable to now cure their default, the [contracts] may not be assumed and assigned.").

22. This is consistent with the premise of the "neutral transfer rule" that the debtor only holds such rights under a contract that existed as of the petition date, and such rights are not amplified unless the Bankruptcy Code specifically does so. In re Lucre, Inc., 339 B.R. 648, 654-55 (Bankr. W.D. Mich. 2006); see In re Fleming Cos., 499 F.3d 300, 308 (3d Cir. 2007) ("Section 365(f) requires a debtor to assume a contact subject to the benefits and burdens thereunder.").

23. To determine whether a noncurable breach is sufficient to preclude assumption, the courts use a "material and economically significant" standard. In re Joshua Slocum Ltd., 922 F.2d 1081, 1092 (3d Cir. 1990); see New Breed, 278 B.R. at 321 (following Joshua Slocum). This standard does not require that the damages from the breach be "material and economically significant." Instead, the courts look at the materiality and economic significance of the term of the contract at issue. Thus, to preclude assumption, a noncurable default must (i) be of a term in the contract at issue that is integral to bargain struck between the parties (a "material" term) and (ii) deny a party the full benefit of that bargain (thereby being "economically significant"). See Fleming Cos., 499 F.3d at 305-06 (citing Joshua Slocum, 922 F.2d at 1092 and explaining Joshua Slocum "material and economically significant" standard); cf. Lucre, 339 B.R. at 652 ("The right of one party to cease performing under an agreement if the other party is in material breach is fundamental to any contract where both parties have ongoing performance obligations").

24. Based on the Debtor's Post-Petition Breach of a material term of the Contract that is not curable, the Contract is not assumable, and Arch therefore seeks an Order from this Court finding that "cause" exists under § 362(d)(1) to modify the stay so that Arch can terminate the Contract.

**ARGUMENT**

25. The Debtors' Post-Petition Breaches of the Contract are historical facts and are not capable of cure. Under the terms of the Contract, the Post-Petition Breaches give rise to a specific right of termination. Thus, the only question is whether MBC's failure to meet the weekly BTU specification is a material breach sufficient to preclude assumption of the Contract. If so, this noncurable breach provides sufficient cause to modify the stay to allow Arch to terminate the Contract.

26. The 12,000 BTUs specification in the Contract is a <u>minimum</u>. Arch delivers the coal it purchases from MBC to end users who have specified their own minimum BTU requirements. The coal delivered by MBC pursuant to the Contract is used to fulfill Arch's obligations under such outgoing orders and is intended to be blended with other coal with the same specifications. If the coal MBC delivers does not meet the required specifications, Arch can be subjected to financial penalties and the ultimate buyer may even have the right to reject coal deliveries from Arch.

27. Thus, the BTU requirement is an important, negotiated, and material term of the Contract.

28. Because of the importance of the coal specifications, the parties negotiated the provision in paragraph 18 of the Contract allowing Arch to cancel the Contract if MBC failed to meet the specifications over a one week period. Because the coal is tested after it is unloaded, Arch does not know whether the coal MBC delivers meets the specifications until the coal is already stored in a common stockpile. Once the non-compliant coal is discovered, Arch suffers issues at its dock, including the loss of space necessary to segregate the non-compliant coal and, if the ultimate buyer rejects the coal, Arch must find a new buyer for barges already loaded with rejectable coal (which is done at a very steep discount).

29. The cancellation provision is provided because once Arch has had to endure these consequences, the parties agreed that Arch would not have to face that risk again and would have the option to terminate the Contract. This provision is fair because MBC has full control of the specifications of the coal, but Arch incurs the consequences when the coal does not meet those specifications.

30. The inclusion of the Arch's right to cancel the Contract, which is conditioned <u>specifically</u> upon the failure to satisfy the negotiated specifications for the coal, is further evidence that the specifications, including the BTU requirement, are negotiated and material terms of the Contract.

31. This conclusion is supported by a recent decision from the Southern District of Georgia. In <u>In re Williams</u>, the debtor's use of leased truck for personal purposes was prohibited under the terms of a lease for the vehicle. The lease contained a <u>general</u> default provision. 299 B.R. at 684-85. The Bankruptcy Court found that the debtor's actions created a non-monetary default that not only could not be cured, but also precluded assumption of the lease. <u>Id</u>. at 686. The Court therefore granted the lessor relief from the stay so that it could exercise its rights under the default provisions of the lease. <u>Id</u>. at 687.

32. The coal BTU specifications in the Contract are at least as material as the use restriction in <u>Williams</u>, and the <u>specific</u> default provision in the Contract provides even more basis for a finding of materiality than in <u>Williams</u>. See also <u>New Breed</u>, 278 B.R. at 322-24 (finding that Debtor's failure to close stock purchase agreement was a non-curable default, the default was material because time was of the essence, and providing cause to grant the non-debtor relief in order to exercise its rights to terminate the contract); <u>Deppe</u>, 110 B.R. at 904, 906-07 (finding 19-day interruption in gas station operations was a non-curable default which was material under state law and granting relief from stay to allow non-debtor to terminate contract); <u>Ruiz</u>, 98 B.R. at 638-39 (finding that debtor's breach of contract by comingling fuel was noncurable, prohibiting assumption of contract, and providing cause to lift stay to allow non-debtor party to terminate contract).

33. As explained in the recent decision by the Third Circuit Court of Appeals in <u>In re Fleming Companies, Inc.</u>, materiality does not depend on the existence of monetary damage or even the debtor's ability to provide substitute performance. 499 F.3d 300. Under the contract at issue in <u>Fleming</u>, the Debtor was required to supply groceries from a specific facility. The Debtor, however, was no longer able to supply groceries from that facility, resulting in a breach of that provision and the inability to comply with it in the future. In an effort to cure that breach and provide adequate assurance of performance in order assume the contract, the Debtor offered substitute performance.

34. The Third Circuit, however, determined that the provision was material. In response to the Debtor's argument that the substitute performance avoided any economic effect on the non-debtor party, the Court responded that even without a monetary effect, a term in a contract can be material:

> The resolution of this dispute does not depend on whether a term is "economically material." Rather, the focus is rightly placed on the importance of the term within the overall bargained-for exchange; that is, whether the term is integral to the bargain struck between the parties (its materiality) and whether performance of that term gives a party the full benefit of his bargain (its economic significance).

<u>Fleming Cos.</u>, 499 F.3d at 306. Because the express condition was an integral part of the agreement, it was material, and the debtor's inability to comply with that provision prohibited assumption of the contract. <u>Id</u>. at 307.

35. Equivalent circumstances are present in this case. The BTU specification and cancellation provision were integral to the bargain between MBC and Arch, and if the Court does not permit Arch to exercise its right to terminate the Contract, Arch will not receive the full benefit of its bargain. <u>See also</u> <u>Claremont Acquisition Corp.</u>, 113 F.3d at 1032-33 (finding failure to operate gas stations for seven consecutive days provided basis to terminate agreements

and could not be cured); Joshua Slocum Ltd., 922 F.2d at 1092 (holding that lease provision allowing termination if certain yearly sales levels were not met was material, bargained-for term and breach thereof was uncurable, preventing assumption of the lease); In re Eagle Creek Subdivision, LLC, 397 B.R. 758, 763-65 (Bankr. E.D.N.C. 2008) (finding failure to close real estate purchase contract timely when time was of the essence was an uncurable breach, closing term was material, and debtor was precluded from assuming the contract).

## CONCLUSION

The BTU specifications were a material, negotiated term of the Contract between Arch and MBC. MBC has breached that provision and is unable to cure that breach. Under governing law, this uncurable breach provides sufficient cause to modify the automatic stay to allow Arch to exercise its specific right to cancel the Contract as a result of the default and thereby receive the benefit of its bargain.

WHEREFORE, Arch respectfully requests an order modifying the automatic stay to permit it to terminate the Contract and for any and all other relief that the Court deems just and equitable.

## NOTICE

ALL PARTIES PLEASE TAKE NOTICE that the foregoing Motion shall be brought on for hearing before the United States Bankruptcy Court for the Eastern District of Kentucky, 100 East Vine Street, Lexington, Kentucky, on June 8, 2009, at the hour of 2:00 p.m., or as soon thereafter as counsel may be heard. Such hearing shall be a preliminary hearing unless otherwise ordered by the Court.

Dated: May 27, 2009 
Respectfully submitted,

/s/ Mary Elisabeth Naumann
Mary Elisabeth Naumann
JACKSON KELLY PLLC
175 E. Main Street, Ste. 500
P.O. Box 2150
Lexington, Kentucky 40588-9945
Telephone: 859/ 255-9500
Facsimile: 859/ 252-0688
E-mail: mnaumann@jacksonkelly.com
*Counsel for Arch Energy Resources, LLC*

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was served by electronic mail upon those persons listed on the Court's CM-ECF electronic service list and by depositing a copy of same in the United States Mail, First Class and postage prepaid, addressed to the parties listed on Master Service List No. 2 dated January 14, 2009 [Docket No. 105], all on the 27th day of May, 2009.

/s/ Mary Elisabeth Naumann
Mary Elisabeth Naumann
JACKSON KELLY PLLC
175 E. Main Street, Ste. 500
P.O. Box 2150
Lexington, Kentucky 40588-9945
Telephone: 859/ 255-9500
Facsimile: 859/ 252-0688
E-mail: mnaumann@jacksonkelly.com
*Counsel for Arch Energy Resources, LLC*

{L0455055.4}    11

**EXHIBIT A**
October 1, 2008 Spot Coal Purchase & Sales Contract

{L0455055.4}

NUMBER: P-198
DATE: 10-01-08

## SPOT COAL PURCHASE & SALES CONTRACT

| BUYER | (1) SELLER | (2) PRODUCER | (3) DELIVERY DESTINATION |
|---|---|---|---|
| ARCH ENERGY RESOURCES, LLC<br>BOX 15992, US 23 SOUTH<br>CATLETTSBURG, KY 41129<br>FED ID: 43-1335853<br>PHONE: 606-739-8558<br>FAX: 606-739-5668<br>Originator: Norman Bradley, Jr. | MILLER BROTHERS COAL LLC<br>ATTN: KEITH FLETCHER<br>1801 WATERGAP ROAD<br>PRESTONSBURG, KY 41653<br>PH: 606-874-7731<br>FAX: 606-874-7705 | Same<br>Various Miller<br>Brothers Coal Jobs | ARCH COAL TERMINAL<br>LOCKWOOD DOCK<br>SPEC: HS |

4. ROUTING INSTRUCTIONS:  TRUCK TO ARCH COAL TERMINAL - LOCKWOOD

5. THIS ORDER EFFECTIVE FROM: 12-01-08   THROUGH:  12-31-09       6. DETENTION/DEMURRAGE:  N/A

7. TOTAL TONS FOR THIS ORDER:  65,000.00 TONS

8. WEIGHTS GOVERNED BY:  ARCH COAL TERMINAL

9. GOVERNING SAMPLE AT ARCH COAL TERMINAL

10. GOVERNING SAMPLE BY (ASTM) STANDARDS APPLY:   STANDARD LABS

11. QUALITY  (QUALITY SPECIFICATIONS ARE ON AS RECEIVED BASIS UNLESS OTHERWISE NOTED)

| QUALITY GUARANTEE | QUALITY ADJUSTMENT CALCULATION |
|---|---|
| MOISTURE    7.00% MAX.<br>ASH          12.50% MAX.<br>SULFUR       3.50% MAX.<br>BTU          12,000 MIN.<br>AFTER W/ REDUCING | Penalty of $.50 per each 1% above 12.50% prorata<br>Penalty of $.75 per each .10% above 3.50% sulfur prorata<br>$.50 per 100 BTU above or below 12,000 BTU prorata |

12. BILLING PRICE (SALES & USE TAX EXEMPTION NUMBER:             $ 80.00         FOB: ACT
                                                                                  Est. haul rate:  $9.00   paid by seller

13. SIZE:  R.O.M. WITH NO COAL LUMPS GREATER THAN 16" DIMENSION IN ANY DIRECTION.

14. SHIPPING INSTRUCTIONS:  * COAL TO BE DELIVERED RATABLY @ 5,000 TONS PER MONTH

15. INVOICING INSTRUCTIONS:  PLEASE SEND APPLICABLE INVOICES, SHIPPING NOTICES, ETC. SHOWING SHIPPING DATE, MODE OF TRANSPORTATION, ORDER NUMBER, CONSIGNMENT AND COAL SEVERANCE TAX SELLER'S CERTIFICATE (KY FORM 55M065) TO BUYER'S ADDRESS.

16. PAYMENT TERMS:  Sent by ACH payment Friday following week of deliveries

17. SPECIAL INSTRUCTIONS:  Use Bar Coded Truck Tickets only and mark all tickets under the Product Description as HS. Please contact Denise Runyon at 606-739-8558 with any general P.O. information.

18. OTHER TERMS & CONDITIONS:  Arch Coal Sales reserves the right to cancel this order if as received quality does not meet specifications on any weekly composite.

THIS CONTRACT IS SUBJECT TO THE ADDITIONAL TERMS AND CONDITIONS SET FORTH ON THE ENCLOSED SHEET WHICH ARE INCORPORATED BY REFERENCE. IT IS AGREED THAT THE TERMS ON THIS FORM AND ANY ATTACHMENTS HERETO SHALL CONSTITUTE THE ENTIRE AGREEMENT BETWEEN BUYER AND SELLER WITH RESPECT TO THE SUBJECT COAL AND THAT ALL OTHER AGREEMENTS, BOTH ORAL AND WRITTEN, WITH RESPECT TO MODIFICATION OF THIS CONTRACT SHALL NOT BE EFFECTIVE UNLESS AGREED TO IN WRITING AND SIGNED BY THE PARTIES.

SELLER:  MILLER BROTHERS COAL LLC                        BUYER:  ARCH ENERGY RESOURCES, LLC

BY:  [signature]                                         BY:  [signature]

TITLE:  [handwritten]                                    TITLE:  DIRECTOR OF TERMINALS AND PROCUREMENT

DATE:  10-4-08                                           DATE:  10-6-08

Exhibit A
Certification of Nonsegregated Facilities

Seller certifies that he does not maintain or provide for his employees any segregated facilities at any of its establishments, and that he does not permit his employees to perform services at any location, under Seller's control, where segregated facilities are maintained. Seller certifies further that Seller will not maintain or provide for Seller's employees any segregated facilities at any of Seller's establishments, and that Seller will not permit Seller's employees to perform services at any location, under Seller's control, where segregated facilities are maintained. Seller agrees that a breach of this certification is a violation of the Equal Opportunity clause referenced in any contract or Purchase Order.

As used in this certification, the term "segregated facilities" means any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, creed, color, or national origin, because of habit, local custom or otherwise.

Seller further agrees that (except where Seller has obtained identical certifications from proposed subSellers for specific time periods) Seller will obtain identical certifications from proposed subSellers prior to the award of subcontracts exceeding $10,000 which are not exempt from the provisions of the Equal Opportunity clause; that Seller will retain such certifications in Seller's files, and that Seller will forward the following notice to such proposed subSellers (except where the proposed subSellers have submitted identical certifications for specific time periods):

---

**NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATIONS OF NONSEGREGATED FACILITIES**

A Certification of Nonsegregated Facilities must be submitted prior to the award of a subcontract exceeding $10,000 which is not exempt from the provisions of the Equal Opportunity clause. The certification may be submitted either for each subcontract or for all subcontracts during a period (i.e., quarterly, semiannually, or annually).

NOTE: The penalty for making false statements in offers is prescribed in 18 U.S.C. 1001.

---

MILLER BROTHERS COAL

By: _____

Its: _____

MILLER BROTHERS
PO# 1983

## SPOT COAL PURCHASE AND SALES CONTRACT
## ADDITIONAL CONTRACT TERMS AND CONDITIONS

The coal purchase and sale under this Contract is governed by the Uniform Commercial Code (U.C.C.) of the State where the coal is produced except for those U.C.C. provisions which are specifically modified by the following terms and conditions:

1. Seller warrants and represents to Buyer that the coal is not subject to any security interest or other lien interest or encumbrance and that the coal conforms both in quantity and quality to the description set forth herein.

2. Actual railroad weights by scales, barge draft weights by independent survey or certified truck scale weights shall govern this Contract and all settlements related hereto.

3. Seller's failure to perform under this Contract shall give Buyer the right to suspend further shipments until Seller demonstrates promptly its ability to perform under the terms and conditions hereof. If in the judgment of the Buyer, Seller is unable to demonstrate promptly its ability to perform, then Buyer shall have the right to terminate the balance of this Contract without further obligation to Seller.

4. Any "Delivered" term used herein shall be construed as a pricing and delivery term, guaranteeing to Seller the price at which the coal is sold, or is to be sold, but the Seller shall have the risk of loss from any casualty to the coal, regardless of cause, until the coal has been inspected and accepted by Buyer and delivered to Buyer.

5. Neither party shall be liable to the other for failure to deliver or take coal because of the effects of events beyond its control, and not due to its own negligence, such as Acts of God, fire, floods, strikes, lockouts, labor disputes, accidents, major breakdown of equipment, shortage of carriers' equipment, and all other similar events of force majeure, except general economic conditions. Tonnage subject to force majeure shall be made up if Buyer so elects. Either party desiring to invoke this provision shall promptly notify the other party in writing and shall include in such notice an estimate of the time that will lapse before it can resume its performance. If Seller notifies Buyer that its performance will be interrupted for a period in excess of forty-five (45) days, Buyer shall have the option, but shall not be obligated, to terminate the balance of this Contract by giving written notice of termination to Seller, and in such event neither party shall incur any further obligations to the other as a result of such termination. Buyer and Seller, notwithstanding any commercial practices in the industry to the contrary, intend by this clause to excuse any total or partial failure to perform under this Contract which is caused by, or exists coincidentally with, any event beyond the control of the party claiming the excuse and which is not due to that party's negligence or default. A party's refusal to settle labor disputes on terms it considers unsatisfactory shall not affect that party's ability to claim force majeure.

6. Analysis of coal to be delivered hereunder shall be based upon random representative samples taken by the sampling party at its expense and in accordance with the sampling procedure at delivery destination. Either party shall have the right to have its representative present to observe sampling and analysis. In the event of dispute, a portion of the sample shall be analyzed by an independent commercial testing laboratory, whose analysis shall govern. ASTM standards shall apply.

7. Seller shall have the right to provide increments of coal that offset and remedies the quality of increments of coal delivered which grossly fails to meet the quality specifications provided herein. If Seller fails to provide such remedy in a timely manner then the Buyer shall have the right to reject, revoke acceptance or renegotiate price of any one or more increments of coal shipped by Seller which grossly does not meet the quality specifications described herein.

8. The Seller shall be responsible for any loss caused by improper preparation or substitution and for any losses caused by failure to ship coal under the terms of this Contract.

MILLER BROTHERS
PO# 1983

9. Buyer shall be entitled to all incidental and consequential damages including, but not limited to, all expenses reasonably incurred in inspection, receipt, transportation, care and custody of coal rightfully rejected, damages resulting from the non-fulfillment of any general or particular requirements or needs of Buyer of which Seller has knowledge or has reason to be aware at time of shipment to Buyer, and all attorney fees related thereto. The benefit of all warranties and representations made by Seller shall extend to Buyer and to purchasers from Buyer. Any purchaser from Buyer is entitled to bring an action against Seller for damages or injuries sustained by that purchaser resulting from Seller's breach of such warranties or representations.

10. Buyer shall have the right to audit Seller's records that may in Buyer's sole judgment have any bearing on or pertain to any business conducted between the parties, including all documents, books, papers and other data except information concerning Seller's profit margin. Seller shall cooperate in furnishing all requested records. Audits shall be conducted in accordance with generally accepted audit practices.

11. Seller warrants and represents that the coal sold under this Contract has been produced in full and complete compliance with all applicable laws and regulations.

12.1 The parties shall comply with all laws, orders, rules, regulations and requirements of every duly constituted governmental authority, agency or instrumentality, which may be applicable to this Agreement or its subject matter, including but not limited to, mandatory drug testing regulations promulgated by the Department of Transportation (Federal Highway Administration, 49 CFR Parts 40 and 391), the Federal Coal Mine Health and Safety Act, the Fair Labor Standards Act of 1938, the Rehabilitation Act of 1973, the Americans with Disabilities Act of 1990, the Vietnam Era Veterans Readjustment and Assistance Act of 1974, Executive Order 11625 (October 13, 1971), the Family and Medical Leave Act of 1993, and U.S. Government Policies concerning Affirmative Action Compliance Programs (41 CFR 60-250.4 (Disabled Veterans and Veterans of the Vietnam Era) and 41 CFR 60-741.5(a) (Rehabilitation Act).

12.2 The parties to this Agreement are Equal Opportunity Employers, and in the performance of this Agreement, shall not engage in any conduct or practice which violates any applicable law, order or regulation prohibiting discrimination against any person by reason of his or her race, color, religion, national origin, sex or age. The parties shall comply with the requirements of Executive Order 11246, and the regulations promulgated thereunder by the Federal Contract Compliance Office of the Department of Labor and all other government agencies authorized to issue regulations under Executive Order 11246, the Civil Rights Act, and the Age Discrimination in Employment Act, and the Uniformed Services Employment and Reemployment Rights Act (USERRA).

12.3 If Buyer does not have on file a current Non-Segregated Facilities Certificate signed by Contractor, within ten (10) days after signing this Agreement, Contractor shall furnish to Buyer a statement that it does not maintain any segregated facilities or permit his employees to Work at any location under his control where segregated facilities are maintained in substantially the same form as Exhibit A, attached hereto. Contractor agrees to provide such information from time to time thereafter as Buyer may request and as required by law. This statement (certification) is required by the U.S. Code of Federal Regulations (See 41 CFR 60-1.8(b)).

12.4 Buyer is required by law to include certain provisions of federal laws in contracts and purchase orders. Therefore, the provisions of this subsection are also required by law. If Contractor has fifty (50) or more employees and this Agreement is for Fifty Thousand Dollars ($50,000) or more, then Contractor agrees to establish a written Affirmative Action Compliance Program in accordance with 41 CFR 60-1.40.

13. Buyer shall at all times have the right to deduct from any sums owing to Seller any amounts owing to Buyer from Seller.

14. If the coal is sold FOB destination, Seller or its transportation agent shall maintain, at its sole cost and expense, insurance for: 1.) Statutory Workers' Compensation for state of hire/operation; 2.) Commercial General Liability with limits of not less than $1,000,000 combined single limit for bodily injury and property damage liability (such policy shall include contractual liability covering the indemnity provision of this Contract); and 3.) Automobile Liability with limits of not less than $1,000,000 combined single limit for bodily injury and property damage liability (such policy shall include coverage for owned, hired and non-owned vehicles). Such insurance limits and coverages set forth are minimum requirements and shall not be construed in any way to limit Seller's liability hereunder. Certificates of insurance with companies acceptable to Buyer

MILLER BROTHERS
PO# 1983

shall be provided to Buyer at Buyer's request. Buyer shall receive thirty days prior written notice of any cancellation of or material change in Seller's policies. Coverage under all insurance required to be carried by Seller shall be primary insurance exclusive of any other existing valid and collectible insurance.

15. Seller agrees to indemnify, defend, and save harmless Buyer, its parent, subsidiaries and affiliates and their officers, directors, employees, agents and invitees from and against any and all claims, demands, or suits (including, but not limited to, claims, demands, or suits for bodily injury, illness, disease, death or for loss of services, property, wages or profit) which may be brought against Buyer, its parent, subsidiaries or affiliates or in which they may be named a party defendant, in any way arising out of or incident to the performance of this Contract or in any way arising out of the use by Seller of common operational areas or common areas of ingress or egress to work areas, regardless of whether such claims, demands, or suits are occasioned by the negligence of Buyer, its parent, subsidiaries or affiliates and regardless of whether such negligence precedes the execution of this Contract.

16. The use of any subcontractor is subject to Buyer's prior written consent. If Seller uses any subcontractors, Seller agrees that any subcontractors shall be required to maintain equivalent indemnity and insurance provisions as those required hereunder.

17. Except for the willful and malicious acts of Buyer's employees or the employees of its parent, subsidiaries or affiliates, Seller releases Buyer, its parent, subsidiaries and affiliated from liability for damage to any of its material, machinery, equipment, or other property regardless of whether such damage is caused by the negligence of Buyer, its parent, subsidiaries, affiliates or any other person.

**EXHIBIT B**
Producer Performance Reports

{L0455055.4}

**ARCH COAL, INC.**

TRUCK RECEIPT QUALITY ANALYSIS BY OPERATOR
-- By Product
Purchasing Company: ACS

From: April 19, 2009    To: April 25, 2009
Supplier: MILLER BROS. COAL, INC.
Complex: ALL

| Supplier | Product | Origin | Seam/Split | Stockpile | Tonnage | LDS | Moist. | Ash | Sul. | BTU | MAF | SO2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MILLER BROS. COAL, INC. | | | | | | | | | | | | |
| | P-1983 | 310 | H 5 | HIGH SULFUR | 42.08 | 1 | 7.63 | 7.84 | 1.38 | 12,424 | 14,698 | 2.22 |
| | | 310 | SKY 8 | HIGH SULFUR | 329.21 | 8 | 10.36 | 8.00 | 1.09 | 11,462 | 14,040 | 1.90 |
| | | 479 | 8 BOTTOM | HIGH SULFUR | 623.36 | 15 | 6.39 | 14.73 | 3.50 | 11,603 | 14,707 | 6.06 |
| | | 479 | 8 TOP | HIGH SULFUR | 413.08 | 10 | 5.08 | 10.18 | 4.30 | 12,484 | 14,730 | 6.89 |
| | | | | Product Total: | 1407.73 | 34 | 6.97 | 11.61 | 3.11 | 11,853 | 14,558 | 5.22 |

Redacted

Page 1    Report run on: April 27, 2009 9:55 AM

Producer Performance Report

From: 04/19/2009  To: 04/25/2009  Buy/Sell: Buy  Facility: ACT

MILLER BROS. COAL, INC.

P-1983     31050

HS

| Date | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1,407.73 | 79.26 | 6.97 | 11.61 | 3.11 | 11,853 | 14,558 | 5.22 |
| | 1,407.73 | 79.26 | 6.97 | 11.61 | 3.11 | 11,853 | 14,558 | 5.22 |
| 04/20/2009 | 205.89 | 78.25 | 6.35 | 13.44 | 3.52 | 11,774 | 14,679 | 5.98 |
| 04/21/2009 | 206.22 | 79.6 | 6.21 | 13.09 | 3.16 | 11,949 | 14,806 | 5.29 |
| 04/22/2009 | 211.25 | 72.87 | 6.59 | 17.59 | 3.82 | 11,098 | 14,637 | 6.88 |
| 04/23/2009 | 207.56 | 78.14 | 5.31 | 10.04 | 4.21 | 12,453 | 14,710 | 6.77 |
| 04/24/2009 | 576.81 | 82.25 | 8.19 | 8.81 | 2.29 | 11,907 | 14,341 | 3.75 |

Redacted