UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
PIKEVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 11 |
| | ) | |
| CLEARWATER NATURAL RESOURCES, LP; ET AL., | ) ) | CASE NO. 09-70011 |
| | ) | JOINTLY ADMINISTERED |
| DEBTORS. | ) | |
| | ) | JUDGE WILLIAM S. HOWARD |
| | ) | |

## ICG ADDCAR SYSTEMS, LLC'S MOTION TO MODIFY THE STAY TO PERMIT TERMINATION OF CONTRACT WITH DEBTOR

Pursuant to 11 U.S.C. § 362(d), Federal Rules of Bankruptcy Procedure 4001(a) and 9014, and Local Rule 4001-1, ICG ADDCAR Systems, LLC ("ADDCAR"), by counsel, files this motion requesting a modification of the automatic stay in order to permit ADDCAR to terminate a contract mining agreement with Debtor Miller Bros. Coal, LLC as permitted by and in accordance with the terms of the agreement (the "Motion").

Under the agreement, ADDCAR mines coal as a subcontractor for the Debtor at the Debtor's Yellow Mountain job with highwall mining equipment valued at $12 Million. The Debtor in turn has a contract mining agreement with Consol of Kentucky Inc. ("Consol") for the Yellow Mountain job pursuant to which the Debtor is required to produce coal. ADDCAR is not a party to the Debtor's contract with Consol. On May 15, 2009, the Debtor unilaterally suspended ADDCAR's performance under the ADDCAR agreement for an indefinite period of time because Consol immediately suspended the acceptance of shipments of coal from the Debtor under its contract.

{L0457737.5} 1

The Debtor asserts that Consol's suspension of performance constitutes a force majeure event under ADDCAR's contract. ADDCAR has not acceded to this position and has been charging the Debtor standby charges under the agreement at the rate of $7,000 per day. The Debtor, however, has refused to pay the standby charges. In the meantime, ADDCAR incurs costs in excess of $7,000 per day (the contractual liquidated damages provision in the event of an idling of the job by the Debtor) because its large mining system remains idle and non-productive, while at the same time ADDCAR continues to maintain its work force and equipment on standby pending the direction to return to work by the Debtor, as the case may be.

Because the suspension of performance has exceeded 30 days and is a post-petition event, regardless of whether the Debtor is correct as to the existence of a force majeure event, ADDCAR is contractually entitled to terminate the agreement, remove its equipment, and mitigate its losses. ADDCAR does not ask the Court to determine the validity of the Debtor's declaration of a force majeure event at this time, which can be determined at a later date, but only to decide that ADDCAR has the right to terminate the contract in accordance with its express terms and to provide ADDCAR with relief from the stay to do so. ADDCAR is suffering sizeable costs and damages resulting from the Debtor's suspension of performance. ADDCAR has filed this Motion to prevent it from continuing to suffer these large daily damages. Accordingly, cause exists to modify the stay to allow ADDCAR to terminate the agreement.

In further support of this Motion, ADDCAR respectfully states as follows:

**DEBTOR IDENTIFICATION**

1.   As required by this Court's order dated January 9, 2009 [Docket No. 90], ADDCAR identifies the Debtor for whom this Motion is relevant as **Miller Bros. Coal, LLC**, the Debtor in **Case No. 09-70012**, which case is jointly administered as part of the above-

captioned proceedings pursuant to this Court's Order Granting Motion For Joint Administration entered on January 9, 2009 [Docket No. 82].

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157.

3. The statutory predicate for the relief requested in this Motion is 11 U.S.C. §§ 362(d)(1).

4. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTS

5. On January 7, 2009 (the "Petition Date"), Clearwater Natural Resources, LP, Miller Bros. Coal, LLC ("MBC"), and Clearwater Natural Resources, LLC (collectively, the "Debtors") each filed a petition for relief under chapter 11 of the United States Code (the "Bankruptcy Code"), commencing the above-captioned bankruptcy cases (the "Cases").

6. Since the Petition Date, the Debtors have continued to operate and manage their businesses as debtors in possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.

### The Contract Mining Agreement

7. MBC is a party to a Contract Mining Agreement dated September 12, 2008 with ADDCAR (the "Agreement"). (See Affidavit of Johnny Sturgill ("Sturgill Aff.") at ¶ 4, Ex. 1, which affidavit is attached hereto as Exhibit A.) Under the terms of the Agreement, MBC engaged ADDCAR to mine coal from the Hazard # 8 seam of coal at MBC's Yellow Mountain job using ADDCAR's patented Highwall Miner System.

8. The term of the Agreement was to run from November 30, 2008 to the earlier of December 21, 2010 or the date upon which ADDCAR mined all of the coal. (Agreement § 3 at 4.)

9.      In return for ADDCAR's provision of highwall mining services, MBC agreed to pay ADDCAR a tonnage fee based on the number of tons mined during each month of the term of the Agreement.  Payments were to be made on a weekly basis based on the tonnage fee applicable to the expected number of tons to be mined in any given month.  If the actual tonnage mined differed from the estimated tonnage, due to no fault of ADDCAR, any difference in the tonnage fee was trued up in the first payment of the following month.  (Agreement § 4 at 5, Ex. B.)

10.     The ADDCAR Mining System consists of complicated, extensive, and expensive patent-protected equipment.  The system deployed at MBC's Yellow Mountain job is a $9 Million broad bench highwall miner comprised of a 30 foot tall launch vehicle, a crawler-mounted underground continuous miner, a military-grade navigation device, 40 foot sections of cascading conveyor cars, a stacker conveyor, and wheel loader with forklift attachment.  (See Sturgill Aff. at ¶ 5.)  In addition, ADDCAR has deployed another $3 Million in supporting equipment, including generator sets and loaders.  (Id. at ¶ 6.)  In sum, ADDCAR has deployed over $12 Million in equipment at MBC's Yellow Mountain job pursuant to the terms of the Agreement.

11.     In addition to the equipment, the operation of the ADDCAR System requires a significant work force, ranging from 17 to 25 onsite employees, to operate and maintain the machinery.  (Id. at ¶ 7.)

12.     It costs ADDCAR substantial sums of money each day to have its ADDCAR System deployed, but not operational.  While ADDCAR's equipment is idle at the Debtor's mine site, ADDCAR is unable to deploy its equipment elsewhere and suffers large carrying costs described above.  (Id. at ¶ 13.)  Moreover, if the equipment is idled, ADDCAR's employees are

furloughed without pay (but with benefits), causing extreme hardship to the employees and their families, and with continued costs to ADDCAR for the maintenance of benefits.  (Id. at ¶ 14.)  Additionally, ADDCAR suffers increased costs as a result of unemployment claims when employees are laid off or furloughed.  (Id.)

13.     Due to the value of the equipment involved and the daily costs of keeping that equipment deployed and staffed for operations, the Agreement provides for the payment of a standby charge to ADDCAR for any interruptions in production caused by MBC:

> In the event that after the Commencement Date mining operations at the Property are interrupted or prevented due to the fault of Owner and Contractor is thereby prevented from operating the ADDCAR System for a period of more than twenty-four (24) hours, a standby charge of Seven Thousand Dollars ($7,000.00) per day shall be paid to Contractor by Owner commencing on the date of the interruption of mining operations and continuing until operations are resumed . . ..

(Agreement § 4 at 6.)  The $7,000 per day is an agreed amount to approximate loss suffered by ADDCAR during any standby period.  (Sturgill Aff. at ¶ 15.)  The Debtors have refused to pay this charge or acknowledge that they are obligated to do so.  See infra ¶¶ 22-24.

14.     If the interruption continues for more than 30 days, the parties have the right to terminate the Agreement, effective 30 days from written notice of the election to terminate:

> In the event that Owner incurs standby charges pursuant to this Section over a continuous period of thirty (30) calendar days, then either the Owner or the Contractor may elect to terminate this Agreement upon written notice to the other party, in which such event this Agreement shall terminate thirty (30) days after the date on which such written notice of termination is delivered.  Standby charges shall continue to accrue hereunder until the date of termination.

(Agreement § 4 at 6.)

{L0457737.5}                                         5

15. The Agreement also contains a force majeure provision that excuses the parties from the performance of their obligations under the Agreement for the duration of the force majeure event:

> Should either party hereto be delayed in or prevented from performing, in whole or in part, any obligation or condition hereunder (other than the payment of monies due hereunder), or from exercising its rights . . . by reason of or as a result of any event of force majeure, the Parties shall be excused from performing their respective obligations hereunder until the event of force majeure ends. . . . The term "force majeure" as used herein, means labor disputes, adverse mining conditions, entrapment of the HWM, mechanical breakdowns of equipment used to receive and process the Coal, impositions by state or federal regulatory authorities, acts of God, including, without limitation, weather, and other similar or dissimilar events outside of the control of such party. The party asserting force majeure hereunder shall notify the other party as soon as possible of such occurrence and shall take all reasonable efforts to abate same. <u>If such condition or event continues for a period in excess of thirty (30) continuous days, then either party shall have the right to terminate this Agreement upon five (5) days written notice</u>.

(Agreement § 13 at 12-13 (emphasis added).) The Debtor has invoked this provision as the basis for its unilateral suspension of ADDCAR's operations. As stated above, if the force majeure event continues for a period in excess of 30 days, either party has the right to terminate the Agreement upon five days written notice to the other party. (<u>Id</u>. at 13.)

16. ADDCAR has complied with all of its obligations under and the terms of the Agreement since the Petition Date. (<u>See</u> Sturgill Aff. at ¶ 8.)

### MBC's Declaration of an Alleged Force Majeure Event

17. In the late afternoon on Friday May 15, 2009, ADDCAR received oral directions from MBC to suspend its work under the Agreement. (<u>See</u> Sturgill Aff. at ¶ 9, Ex. 2.) In response to that oral notice, ADDCAR notified MBC that standby charges would begin to accrue under the terms of the Agreement. (<u>Id</u>. at ¶ 10, Ex. 2.)

18.     ADDCAR subsequently received correspondence by electronic mail from MBC in which MBC declared the existence of an alleged force majeure event suspending the necessity for its performance under the Agreement.  (See Sturgill Aff. at ¶ 11, Ex. 3.)  The correspondence states:

> Miller Bros. received today [May 15, 2009] the notice of force majeure from Consol of Kentucky Inc. attached hereto.  This declaration of force majeure by Consol of Kentucky Inc. (and Consol's referenced suspension of its performance of its agreement with Miller Bros.) constitutes a force majeure event under the Agreement.

The declaration of force majeure by Consol referenced in MBC's letter states that Consol is unable to accept coal from MBC at the Jones Fork Preparation Plant and that, accordingly, Consol is idling the plant.  (Id.)  Consol further states that it is unable to predict when shipments can resume.  (Id.)

19.     As set forth in the Emergency Motion of Consol of Kentucky Inc. for Relief from the Automatic Stay filed in the above-captioned proceeding [Docket No. 426], Consol provided MBC with the rights to mine the Yellow Mountain properties pursuant to a contract mining agreement.  Thus, in furtherance of that agreement, MBC entered into a separate contract with ADDCAR to perform the mining required under its contract with Consol.

20.     In the Agreement, however, MBC expressly represented and warranted to ADDCAR that MBC had

> secured and will maintain in place during the Term . . . of this Agreement all surface mining permits and real property rights necessary for the mining and removal of the Coal from the Mining Area as contemplated in this Agreement.

(Agreement § 2 at 4 (emphasis added).)

21.     While nothing in the Agreement (i) mentions Consol, an agreement between MBC and Consol, any of Consol's rights to the property to be mined, or Consol's rights under,

whether with respect to force majeure or otherwise, any contract with MBC or, significantly, (ii) provides that Consol's default or suspension of performance under its agreement with MBC, or the default or suspension of performance under any third party agreement for that matter, affects the obligations of the parties under the Agreement in any way[1], whether MBC's declaration of force majeure was permissible is an issue that can determined later.

### Post-Suspension Events

22. On June 1, 2009, ADDCAR issued two invoices to MBC related to the Agreement: (a) The first invoice numbered 115011 assessed $84,000 for standby charges for 12 days under the Agreement (see Sturgill Aff. at ¶ 16, Ex. 4); and (b) The second invoice numbered 115010 reflected the different rates charged per ton depending on the actual monthly production and was a true-up invoice in the amount of $131,756.29 for tonnage fees for the actual production in the month of May 2009[2] (see Sturgill Aff. at ¶ 18, Ex. 5).

23. Both invoices were due and payable on June 11, 2009 as post-petition obligations of the Debtors. (See Sturgill Aff. at ¶ 22, Exs. 4-5)

24. After receiving the invoices, MBC provided correspondence to ADDCAR on June 3, 2009 in which it:

(i) disputed the assessment of standby charges, reasserting its claim that the suspension was due to a force majeure event, and also argued, contrary to and without any support in the plain language of the Agreement, that because ADDCAR would have had sufficient time

---

[1] The only reference in the Agreement to any other party is in ADDCAR's acknowledgement that MBC had agreed to provide a third party with the coal mined under the terms of the Agreement. (Agreement § 10 at 9.) And this provision is included solely to clarify that in the event ADDCAR breaches the Agreement, it may be liable for any consequential damages MBC incurs to that third party – it has no connection to any of the other provisions of the Agreement. (Id.)

[2] At the time of MBC's suspension of performance under the Agreement, ADDCAR had shipped 38,751.85 tons of coal to MBC during the month of May 2009. The preliminary invoice for those tons had charged the lower per ton rate based on an assumed 100,000 tons and above for the month of May. Invoice 115010 simply assessed the difference between that rate and the higher tonnage rate for mining 50,000 tons or less during May 2009.

{L0457737.5}                              8

in the remainder of May 2009 to mine at least 50,000 tons, such tonnage was imputed to ADDCAR and barred the assessment of standby charges even in the absence of a force majeure event;

(ii)    contested, without providing any support in the language of the Agreement, the tonnage rate adjustment based on the force majeure event; and

(iii)   requested that ADDCAR agree not to terminate the Agreement <u>before the end of the 2009 calendar year</u>.

(See Sturgill Aff. at ¶ 20, Ex. 6.)

25.    <u>This request, if honored, would result in ADDCAR incurring carrying costs of at least $1,400,000 (200 days at $7,000 per day) without any revenue whatsoever</u>.

26.    On June 5, 2009, ADDCAR responded to MBC's correspondence reasserting its contention that the suspension required the assessment of standby charges, disputing MBC's interpretation of the Agreement terms, and refusing to waive any of ADDCAR's rights to terminate the Agreement based on MBC's actions.[3]  (See Sturgill Aff. at ¶ 21, Ex. 7.)

### ADDCAR's Right to Terminate the Agreement

27.    As a result of MBC's actions and in response to MBC's express directions, ADDCAR has suspended its operations at Yellow Mountain.  (See Sturgill Aff. at ¶ 12.) Because there was no work, the vast majority of the ADDCAR employees working at the job have been furloughed since May 15, 2009.  (Id.)  As of this date, ADDCAR's equipment has been continuously idle at the mine site for 31 days.  (Id.)

28.    As a result of the suspension of activities under the Agreement for a period of 30 days, ADDCAR has the right to terminate the Agreement under the standby charge provision.  In

---

[3]   There were subsequent communications between the parties on June 11, 2009 concerning the future of the Yellow Mountain job; however, those discussions confirmed that MBC did not anticipate that normal operations would resume before January 2010.  (See Sturgill Aff. at ¶ 23.)

{L0457737.5}                                       9

addition, and if MBC's assertion of a force majeure event is accurate, ADDCAR <u>also</u> has the right to terminate the Agreement upon five days written notice under the force majeure provision. Thus, under any interpretation of the Agreement, ADDCAR is entitled to terminate the Agreement as of June 14, 2009.

29. ADDCAR has determined that it desires to terminate the Agreement in order to mitigate its losses and to pursue other opportunities to engage in profitable mining operations with its equipment, and ADDCAR therefore seeks relief from the stay to exercise its contractual right to terminate the Agreement and hereby provides written notice of such termination to MBC if the Court grants ADDCAR relief from the stay as requested herein. (<u>See</u> Sturgill Aff. at ¶ 24.)

## LEGAL AUTHORITY

30. Under § 362(d), the bankruptcy courts shall provide a party relief from the automatic stay "for cause:"

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay --
>
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest.

11 U.S.C. § 362(d)(1).

31. The Bankruptcy Code does not define "cause." This lack of a definition provides the Court with flexibility in making a determination of "cause," and therefore, bankruptcy courts must determine when discretionary relief is appropriate under § 362(d) on a case-by-case basis. <u>In re Laguna Assocs. L.P.</u>, 30 F.3d 734, 737 (6th Cir. 1994); <u>In re Mirant Corp.</u>, 440 F.3d 238, 253 (5th Cir. 2006). The Bankruptcy Code provides the Court with the ability to grant this relief

in order to avoid the imposition of an unfair hardship on non-debtor parties. Laguna Assocs., 30 F.3d at 737.

32. The burden of proof is squarely on the Debtors to demonstrate why the automatic stay should remain in effect. 11 U.S.C. § 362(g) (stating that party requesting relief from the stay has burden of demonstrating debtor's equity in property and the debtor "has the burden of proof on all other issues").

## ARGUMENT

33. Thirty days have elapsed since MBC suspended ADDCAR's performance under the Agreement. Under the plain language of the contract, ADDCAR has the right to terminate the Agreement if the suspension was due to a force majeure event. (Agreement § 13 at 12-13.) Also under the plain language of the contract, ADDCAR has the right to terminate if the suspension was caused by a standby event. (Agreement § 4 at 6.) Thus, ADDCAR has the right to terminate the Agreement regardless of the cause of the suspension, and this Court need not address the issue of the basis for the suspension.

34. MBC's election to declare a force majeure event, its refusal to pay standby charges, and its position that ADDCAR must remain in limbo until the end of the year despite the plain language of the Agreement, however, create the cause necessary to support modification of the stay to permit ADDCAR to exercise its contractually-provided termination rights. First, ADDCAR is incurring irreparable harm in the form of unrecoupable costs and expenses and lost opportunities that the terms of the Agreement were designed to avoid; and second, MBC is attempting to enjoy the benefits of a force majeure declaration without experiencing any of the burdens in violation of the terms of the Agreement and the Bankruptcy Code.

**I.  ADDCAR is suffering irreparable damages that the Agreement was designed to avoid, creating an unfair hardship that provides cause for relief from the stay.**

35. The parties stipulated in a liquidated damages provision of the Agreement that ADDCAR's daily damages for a suspension of performance under the Agreement are $7,000 per day. The parties also agreed that under certain circumstances MBC has to pay those amounts to ADDCAR (a standby event), and under certain other circumstances, MBC is excused from paying those amounts (a force majeure event). However, regardless of the reason for the suspension of performance under the Agreement, ADDCAR is still <u>incurring</u> those losses.

36. ADDCAR has provided MBC with the full 30 days within which it may abate a force majeure event. MBC has not resolved the event. As of June 14th, ADDCAR's losses totaled at least $210,000, and for <u>each further day</u> that the Court does not provide ADDCAR with relief from the stay, ADDCAR faces additional losses.

37. The Agreement, however, was specifically negotiated and designed to prevent exactly this situation from occurring. That is, if there is a force majeure event, then ADDCAR does not receive payment for its daily losses, <u>but</u> ADDCAR does have the express right to terminate the Agreement in a short period of time in order to stanch the economic bleeding. This structure ensured that ADDCAR would not have to keep incurring the daily losses it is suffering today, and will suffer tomorrow and every day after that.

38. MBC has denied responsibility for paying standby charges and further unreasonably requests that ADDCAR continue to incur these losses through the end of year. This would result in over $1 Million in additional losses to ADDCAR, <u>which losses</u>, if MBC is correct in its assertion of a force majeure event, <u>may never be recovered by ADDCAR</u>.

39. There is no question this is an unfair hardship on ADDCAR generated solely by the existence of the automatic stay. In the absence of the stay, ADDCAR could exercise its right

to terminate the Agreement and thereby stop the bleeding. Providing relief in these circumstances is the purpose of § 362(d), and relief from the stay for ADDCAR will remedy harm that is exactly the kind § 362(d) is designed to prevent.

**II.  ADDCAR is further subjected to unfair hardship in that MBC elected to declare a force majeure, and absent relief from the stay, only ADDCAR suffers the consequences of that election.**

40. It was MBC's choice to declare a force majeure event. Under the terms of the Agreement, the Debtor either (i) has to pay ADDCAR to standby and be ready to resume work or (ii) has to declare a force majeure event and allow ADDCAR the opportunity to terminate the Agreement in short order. MBC cannot have it both ways. MBC's declaration has consequences under the terms of the Agreement – ADDCAR's contractual right to terminate the contract.

41. Unless ADDCAR is provided relief from the stay to terminate the Agreement, MBC will receive benefits under the Agreement to which it is not entitled either under the Agreement or the Bankruptcy Code. This violates the "neutral transfer rule." Under the Bankruptcy Code, the debtor only holds such rights under a contract that existed as of the petition date. In re Lucre, Inc., 339 B.R. 648, 654-55 (Bankr. W.D. Mich. 2006) (citing and quoting In re Palace Quality Servs. Indus., Inc., 283 B.R. 868 (Bankr. E.D. Mich. 2002)). This concept is bolstered by the fact that none of the provisions of the Bankruptcy Code allow a debtor "to ignore the terms of an executory contract or unexpired lease during the post-petition interval when she is deciding whether to assume or reject it." Palace Quality Servs. Indus., 283 B.R. at 883; see also Lucre, 339 B.R. at 652 ("The right of one party to cease performing under an agreement if the other party is in material breach is fundamental to any contract where both parties have ongoing performance obligations").

{L0457737.5}                                    13

42.     In this case, MBC has the right to declare a force majeure, but it only holds that right in conjunction with ADDCAR's right to terminate the Agreement.

43.     Finally, as a practical matter, it makes no sense to keep the Agreement in place. MBC's own communications to ADDCAR indicate that it does not expect operations to resume until next year, if at all.  If operations resume, MBC is free to obtain a new contract mining agreement at that time or to lease or buy a highwall mining system either from ADDCAR or from one of ADDCAR's competitors in the industry.  Otherwise, either the Debtors will have to pay standby charges for months on end or ICG is irreparably damaged by having its huge, expensive, equipment out of service for an indefinite period of time in violation of its rights under the Agreement and the Bankruptcy Code while it incurs well over a million dollars in costs and expenses, idle equipment and lost alternative profitable mining opportunities.

WHEREFORE, ADDCAR respectfully requests that this Court enter an order finding "cause" to grant ADDCAR relief from the stay; recognizing that ADDCAR provided the requisite written notice to the Debtors to terminate the Agreement as of the date of this Motion; granting ADDCAR relief from the stay in order to exercise its rights to terminate the Agreement; and providing ADDCAR with any and all other relief that the Court deems just and equitable.

## NOTICE

ALL PARTIES PLEASE TAKE NOTICE that ADDCAR has filed a motion contemporaneously herewith requesting an expedited hearing and shortened notice on the foregoing Motion.  That motion requests that the foregoing Motion be heard on June 18, 2009 at 2:00 p.m. before the United States Bankruptcy Court for the Eastern District of Kentucky, Lexington Division, 3rd Floor Courtroom, 100 East Vine Street, Lexington, Kentucky.

Dated: June 15, 2009

Respectfully submitted,

/s/ Mary Elisabeth Naumann
Mary Elisabeth Naumann
JACKSON KELLY PLLC
175 E. Main Street, Ste. 500
P.O. Box 2150
Lexington, Kentucky 40588-9945
Telephone: 859/ 255-9500
Facsimile: 859/ 252-0688
E-mail: mnaumann@jacksonkelly.com
*Counsel for ICG ADDCAR Systems, LLC*

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing was served by electronic mail upon those persons listed on the Court's CM-ECF electronic service list and by depositing a copy of same in the United States Mail, First Class and postage prepaid, addressed to the parties listed on Master Service List No. 2 dated January 14, 2009 [Docket No. 105], all on the 15th day of June, 2009.

/s/ Mary Elisabeth Naumann
Mary Elisabeth Naumann
JACKSON KELLY PLLC
175 E. Main Street, Ste. 500
P.O. Box 2150
Lexington, Kentucky 40588-9945
Telephone: 859/ 255-9500
Facsimile: 859/ 252-0688
E-mail: mnaumann@jacksonkelly.com
*Counsel for ICG ADDCAR Systems, LLC*