```
                    UNITED STATES BANKRUPTCY COURT
                     EASTERN DISTRICT OF KENTUCKY
                          PIKEVILLE DIVISION
```

IN RE:

CLEARWATER NATURAL RESOURCES, LP, et al.

DEBTORS                                   CASE NO. 09-70011
                                          Chapter 11
                                          Jointly Administered

## MEMORANDUM OPINION

This matter is before the court on the Motion to Modify the Stay to Permit Termination of Contract with Debtor for Post-Petition Breaches (Doc. # 452, "the Motion") filed by Arch Energy Resources, LLC ("Arch"). The contract which is the subject of the Motion is between Arch and Debtor Miller Bros. Coal, LLC ("Miller Bros."), and is identified as Purchase Order #1983 ("the Contract"). Arch seeks to terminate the Contract based on its contention that coal delivered by Miller Bros. failed to meet specifications regarding BTUs (the British thermal unit, or BTU, is a measure of the heat the coal will generate) set out in the Contract thus breaching the contract and giving Arch a right to terminate.

Miller Bros. has filed an Objection (Doc. # 479) and a Supplemental Objection (Doc. #542). The court conducted a hearing on July 8, 2009, at which time testimony was elicited by redirect and cross examination of the affiants in this matter, Ron Logan and Keith Fletcher, whose affidavits were tendered in support of Miller Bros., and Calvin Hall and Norman Bradley, whose affidavits were tendered in support of Arch. Having considered all the evidence put forth in this matter, the court makes the following Findings of Fact and Conclusions

of Law:

The case before the court has been very well practiced and the parties have entered into extensive Joint Stipulations and and Joint Exhibits (doc. # 598). The court adopts the Joint Stipulations in their entirety as part of its findings of fact herein as though reproduced verbatim herein and the court has admitted the attached exhibits into evidence.

The Contract, a copy of which is found at Joint Exhibit 2, provides at ¶(18): "Other Terms and Conditions: Arch Coal Sales reserves the right to cancel this order if as (sic) received quality does not meet specifications on any weekly composite." The Contract further provides, in a section titled *Additional Contract Terms and Conditions*,

> 7. Seller shall have the right to provide increments of coal that offset and remedies (sic) the quality of increments of coal delivered which grossly fails to meet the quality specifications provided herein. If seller fails to provide such remedy in a timely manner then the Buyer shall have the right to reject, revoke acceptance or renegotiate price of any one or more increments of coal shipped by Seller which grossly does not meet the quality specifications described herein.

Ron Logan, CRO of the Debtors whose affidavit was filed as Doc. # 544, testified in response to cross examination by Arch concerning the percentage which the Contract represents in terms of Miller Bros.' revenue.

Keith Fletcher ("Fletcher"), Director of Sales and Distribution for Miller Bros., whose affidavit was filed as Doc. # 543, testified in response to cross examination by Arch. Fletcher elaborated on the concern expressed in his affidavit that test sample results from April 24, 2009 regarding eight loads of Sky 8 coal and one load of Haddix 5

coal were inconsistent with testing results of Sky 8 coal shipped to other customers on the same date in which the Sky 8 coal tested at considerably above 12,000 BTUs.  He expressed concern that either the sample results were transposed or the samples themselves were accidentally switched.  (Fletcher Aff., p. 4).  Fletcher also related that on April 27, 2009, Miller Bros. had shipped eight truckloads of Sky 8 coal to Arch in satisfaction of Purchase Order #1980 that tested at 12,345 BTUs.  This coal was from the same pit from which the Sky 8 loads delivered to Arch on April 24 had been taken.  (Fletcher Aff., p. 5).

        Calvin Hall ("Hall"), Director of Procurement and Terminals for Arch whose affidavit was filed as Doc. # 548 and whose supplemental affidavit was filed as Doc. #562, testified in response to cross examination by Miller Bros.  Hall's affidavit provides extensive information concerning how coal is received and tested at Arch's loading facility.  Hall testified that a sample of coal should contain coal from each truckload coming from the same source, and that up to eight truckloads could be in one sampling canister.  Eight truckloads of Sky 8 coal were delivered to Arch on April 24, 2009, and all samples from that coal should have been in the same canister.

        In that regard, Joint Exhibit 4, a computer generated document showing coal truck deliveries by supplier, shows that the last two loads of Sky 8 coal delivered on April 24 arrived at Arch's facility at 3:02 p.m. and 3:25 p.m. respectively.  Joint Exhibit 12, the Single-Stage Total Moisture Worksheet, shows that the sample of Sky 8 coal went into moisture ovens for testing of moisture content at 3:20 p.m.  When asked how the last two loads of Sky 8 coal could have made

it into the canister whose contents went into the moisture ovens by 3:20 p.m. when two loads did not even arrive until after 3:00 p.m., Hall surmised that the individual completing the Total Moisture Worksheet must have entered the wrong time.  This testimony, coupled with the documentary evidence of record in this case, leads the court to find that the issue of the accuracy of the Sky 8 coal analysis on the date in question is suspect, certainly as to the question of whether all of the Sky 8 coal delivered that day was even sampled.

On re-direct examination by Arch, Hall testified that Miller Bros.' proposal to make up quality specifications by delivering more coal on Saturday, April 25 (had Miller Bros.' known of the test results at the time) would not have worked because Arch's facility is not normally open on week-ends.

Norman Bradley ("Bradley"), Manager of Coal Origination and Terminals for Arch whose affidavit was tendered as Doc. # 547, testified on re-cross by Miller Bros. and on redirect by Arch about conversations he had with Fletcher concerning missed specifications in December 2008 and January 2009.  He made reference to a chart in his affidavit which sets out several occasions when minimum specifications were not met.  (Bradley Aff., p. 3).  A more complete version of this chart is found on pages 13-14 of the Joint Stipulations.  It shows that coal shipped to Arch by Miller Bros. missed one or more quality specifications in seven out of the twenty-two weeks between December 8, 2008 and May 23, 2009.  Five of the seven instances of missed specifications involved BTUs below 12,000. (Jt. Stips., pp. 13-14). The testimony established that the procedure Arch used on these occasions for addressing out of specification shipments was to call

Miller Bros. and tell them that they must bring the coal up to the minimums set out in the contract.  No testimony was produced which suggested any previous consideration by Arch of termination of the contract because of failure to meet the contract standards by these minimal margins.  There was also a deduction in the price paid for the lower BTU content of the coal for such shipments as well as a premium for BTU levels above 12,000.

Arch offers evidence, by way of the reports of the analysis of the coal, suggesting that the coal delivered on April 24 did not meet the standards set forth in the contract, being some 147 BTUs or 1.24% lower than the requirements of the contract.  The analysis on that date was flawed, as recited above, by the fact that the recorded times indicate that not all of the coal delivered that day was, in fact, tested. On the same day, Miller Bros. delivered coal from the same pit at the same mine to other customers and again to Arch on the next business day, April 27, which was clearly above the minimum.

It is difficult to account for this anomaly.  No suggestion of bad faith is present between the litigants in this matter.  Miller Bros. suggests simply that a mistake was made regarding the analysis of the coal.  Also the possibility exists, ever present in the coalfields of Eastern Kentucky, that the coal received was not completely identical to the coal loaded on the trucks and shipped to Arch but there is no evidence to support such a theory here.  The weight of the evidence leads the court to conclude that there was a mistake in the analysis of the coal and that the coal delivered on that date did meet the contract specifications.  However the court will proceed to analyze the matter using Arch's results from Standard

Labs' analysis.

Arch contends that it is a forward contract merchant, that the Contract is a forward contract, and that it may therefore terminate the contract without relief from the automatic stay. Miller Bros. responds that the Contract is not a forward contract because it does not contain "a condition of the kind specified in section 365(e)(1) of this title." 11 U.S.C. § 556. Bankruptcy Code section 365(e) states that "an executory contract ... may not be terminated or modified ... solely because of a provision in such contract that is conditioned on the insolvency or financial condition of the debtor ... [or] the commencement of a case under this title." 11 U.S.C. § 365(e)(1)(A), (B). Therefore, Miller Bros. argues, a forward contract may not be terminated without court approval unless the underlying contract includes such a provision. The Contract under consideration has no such provision, and the court agrees that it cannot be terminated without court approval. Whether coal is sufficiently fungible to serve as a commodity subject of a forward contract need not be addressed here.

Having determined that Arch must obtain stay relief in order to terminate the Contract, the court must next decide whether relief is justified. Arch contends that it is entitled to stay relief under Code section 362(d)(1) which provides that a party in interest may seek to have the stay terminated "for cause, including the lack of adequate protection of an interest in property of such party in interest." 11 U.S.C. § 362(d)(1). As stated in *In re Laguna Assocs. Ltd. P'Ship*, 30 F.3d 734, "[b]ecause the code provides no definition of what constitutes 'cause' ..., courts must determine whether

discretionary relief is appropriate on a case-by-case basis." *Id.* at 737.  Pursuant to Code section 362(g), the burden of proof is on Miller Bros. on all issues except that the movant has the burden of demonstrating the debtor's equity in property.

Arch contends that there has been a non-curable, non-monetary default under the Contract, and that this constitutes cause to modify the stay under section 362(d)(1).  Arch states that non-monetary defaults must be cured prior to assumption of a contract. *See In re Claremont Acquisition Corp., Inc.* 113 F.3d 1029 (9th Cir. 1997).  This line of reasoning goes further to contend that the stay should terminate because the contract cannot be assigned due to the default. Arch states that in order to determine whether a non-curable breach is sufficient to preclude assumption, courts employ a "material or economically significant" standard and cites *In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1092 (3rd Cir. 1990) in support of the proposition that it is the **term** of the contract and not the **breach** which must be analyzed for materiality and economic significance.  There the court considered whether the bankruptcy court had authority to excise a "material provision governing the terms of occupancy" under a shopping center lease where that lease was to be assumed and assigned to a third party.  The court determined that the bankruptcy court did not have such authority stating that the property in question was "subject to the heightened restrictions on the assumption and assignment of leases of real property in shopping centers." *Id.* at 1092.

In *In re New Breed Realty Enters., Inc.*, 278 B.R. 312 (Bankr. E.D. N.Y. 2002), the court held that where there is a non-curable default under a contract the debtor wishes to assume, the materiality

7

and economic significance of the **breach or default** is the measure. Citing *Joshua Slocum*, the court stated:

> In *Joshua Slocum*, the Third Circuit articulated a standard which may be applied to determine whether the existence of an incurable non-monetary default precludes assumption of an executory contract or unexpired lease.  There, the court noted with approval the concept that 'the [bankruptcy] court does retain some discretion in determining that lease provisions ... may still be refused enforcement in a bankruptcy context in which there is no substantial economic detriment to the landlord shown, and in which enforcement would preclude the bankruptcy estate from realizing the intrinsic value of its assets.' ... The Third Circuit found in *Joshua Slocum* that a provision in a shopping center lease, allowing for the termination of the lease if certain minimum sales figure were not realized, was 'material in the sense that it goes to the very essence of the contract, i.e., the bargained for exchange,' and that it was 'also reflective of the economic terms of the lease agreement governing occupancy.'

*In re New Breed Realty Enters., Inc.*, 278 B.R. at 321 (internal cites omitted).  *See also In re Chapin Revenue Cycle Mgmt, LLC*, 343 B.R. 728 (Bankr. M.D. Fla. 2006).  This court finds the reasoning articulated by the *New Breed* court to be persuasive, and concludes that it is the materiality and economic significance of the default which is the measure of whether a debtor may assume a contact in which a non-curable, non-monetary default has occurred.  The debtor here seeks to excise nothing from the contract.

Having made that determination, the court goes on to consider whether the default at issue here was "material or economically significant."  Miller Bros. contends that it was not.  Miller Bros. points out that the BTUs of the coal delivered during the week of April 19, 2009 resulted in a weekly composite of 11,853 BTUs, only 147 shy of being in compliance.  Further, there were three greater, although still insignificant Miller Bros. argues, non-compliances in

8

the twenty-two weeks between December 8, 2008 and May 23, 2009, and one non-compliance somewhat less than the subject one. Arch did not invoke paragraph 18 of the Contract, or any other remedy available to it, in regard to these non-compliances. Miller Bros. argues that if any of the previous non-compliances had been economically significant, Arch would have invoked its rights in order to avoid the economic consequences of the non-compliance, but it did not.

Miller Bros. further contends that Arch's acceptance of slightly non-compliant coal on four occasions before the week of April 19 establishes a course of dealing between the parties which altered the parties' agreement and rendered paragraph 18 unenforceable. Miller Bros. states that evidence of parties' course of performance, course of dealing, or usage of trade is admissible to explain or supplement terms of a contract pursuant to KRS 355.2-202. The court must agree that Arch's treatment of the non-compliances that occurred prior to the subject one establishes a course of dealing that militates against its argument that the failure to deliver coal on April 24 that tested out at 12,000 BTUs was a fatal breach and lends credence to the contention that, because of the economic conditions of the coal market, this is merely an excuse to try to terminate a contract which has become unprofitable. If it was a fatal breach on April 24, it would seem to have been fatal on the four occasions prior to April 24.

In consideration of all of the foregoing, this court concludes that Miller Bros. has carried its burden of demonstrating that Arch is not entitled to relief from the automatic stay in order the terminate the Contract, and that Arch's Motion must be overruled. An order in conformity with this opinion will be entered separately.

Copies to:

Mary Elizabeth Naumann, Esq.
Mary L. Fullington, Esq.
Tonya M. Ramsey, Esq.

10

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
*The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.*



**Signed By:**
*William S. Howard*
**Bankruptcy Judge
Dated: Thursday, July 23, 2009
(wsh)**